No. 35,673

J. Peter Boxberger, *Appellee,* v. The Texas Company, Lario Oil & Gas Company, and Phillips Petroleum Company, *Appellants.*

(134 P. 2d 644)

Opinion filed March 6, 1943.

*Redmond S. Cole,* of Tulsa, Okla., argued the cause, and *Jerry E. Driscoll,* of Russell, *George B. Collins,* of Wichita, *D. E. Hodges,* of Bartlesville, Okla., and *B. W. Griffith,* of Tulsa, Okla., were on the briefs for the appellants.

*C. R. Holland,* of Russell, argued the cause, and *George W. Holland* and *Herbert N. Holland,* both of Russell, were on the briefs for the appellee.

The opinion of the court was delivered by

Thiele, J.: This was an action for permanent damages to real estate resulting from pollution caused by acts of the defendants in operations under oil and gas leases, and from a judgment in favor of plaintiff the defendants appeal.

The action was commenced on May 29, 1941. Briefly stated, it was alleged in the petition that plaintiff owned certain real estate, and had executed oil and gas leases thereon, and that other leases on adjoining real estate had been executed, and under those leases the several defendants had constructed and operated oil wells and structures in connection therewith, and that beginning September, 1939, the defendant had caused, permitted and allowed crude oil, base sediment, salt water and water containing mineral substances

to escape from their several wells, salt-water ponds and sump holes into the fresh-water strata underlying and into creeks and springs on plaintiff's lands, and since September, 1939, the water in his wells, springs and creeks was unfit for consumption either for humans or livestock; that such injurious substances had permeated the soil and had damaged his pasture, destroyed his orchards, shade trees and shrubbery, and had damaged his crop lands, all to his damage in the sum of $14,950, for which he sought judgment.

The several defendants filed separate answers. For our purposes, it may be said they contained general and specific denials, and an allegation that if plaintiff had sustained any damages, they were not sustained within a period of two years immediately preceding commencement of the action, and plaintiff's cause of action, if any, was barred by the statute of limitations.

Plaintiff's replies to these answers need not be noticed further than to state they contained general denials.

During the course of the trial and at the close of plaintiff's evidence each defendant demurred, the demurrers being overruled. Plaintiff was permitted to reopen and introduce further evidence, after which the demurrers were resubmitted and overruled, and then each defendant moved the court to instruct the jury to render a verdict in its favor, these motions being denied. Defendants then offered their evidence and plaintiff offered evidence in rebuttal, and thereafter defendants renewed their demurrers which were overruled, their motions for a directed verdict in their favor denied and the cause was submitted to the jury which rendered a judgment in favor of the plaintiff and returned answers to special questions submitted, which will be later mentioned. In due time the defendants joined in and filed a motion to set aside answers to the special questions, and a motion for a new trial. We here note there was no motion for judgment *non obstante veredicto*.

On the motion for a new trial further evidence was offered by the defendants. In ruling on that motion the court made certain statements which will be more fully noticed later, but in effect it stated that most of the evidence was cumulative or repetitive, and inferentially, that it was not newly discovered or could not, with diligence, have been produced at the trial. It overruled the motions to set aside answers to the special questions and for a new trial and rendered judgment for plaintiff. In due time the defendants perfected their appeal to this court. The specification of errors covers the matters hereafter discussed.

Appellants first contend that the undisputed evidence showed the appellee's claim was barred by the statute of limitations and that the trial court should have sustained their demurrers to appellee's evidence or should have allowed their motions for a directed verdict. The latter motions raised the same question as the demurrers. It has been held repeatedly that in considering sufficiency of evidence as against a demurrer, we must take the evidence under attack as true, consider that part favorable and disregard that which is unfavorable, not weigh any part which is contradictory, nor any differences between direct and cross-examination, and if when so considered, there is any which sustains the case, the demurrer must be overruled. (See, e. g., *Robinson v. Short*, 148 Kan. 134, 79 P. 2d 903; *Parker v. City of Wichita*, 150 Kan. 249, 250, 92 P. 2d 80; *Pierce v. Edgerton*, 151 Kan. 107, 111, 98 P. 2d 129; *Bessette v. Ernsting*, 155 Kan. 540, 543, 127 P. 2d 438; and cases cited.) The evidence was voluminous and we need not detail it. In support of their contentions, appellants direct our attention to portions tending to show that the lands were polluted and that appellee was aware of it more than two years before the action was commenced. Our examination of the evidence as set forth in the abstract and counter abstract discloses other evidence from which a contrary conclusion might be reached. Under the rule above stated the trial court did not err in its rulings on the demurrer and on the motion for a directed verdict.

Under different heads, appellants argue that the verdict was not supported by any substantial evidence, and that it was based solely on speculation and guesswork. We note that although appellants requested the trial court to instruct the jury in certain particulars, they asked no instruction as to the measure of damages. In that particular, and speaking generally, the court did instruct that the amount to be allowed, if any, was the difference between the fair and reasonable market value of the land immediately prior to the damage or injury to the land or the pollution of the water thereunder, and the fair and reasonable value immediately after such damage and pollution. The record, as abstracted, shows no objection to this instruction. The complaint lodged against the testimony of witnesses for plaintiff as to value that it is not entitled to any weight because certain alleged factors, such as that the lands were encumbered by operations under the lease before any damage occurred, were not considered in fixing value before the damage, and that the lands still had an ample supply of

usuable water, were raising good crops, etc., were not considered in determining value after the alleged damage, is not good. On cross-examination appellants brought out these facts, and had they wanted to do 'so, they could have inquired of each. witness his opinion as to values with those factors included. Without further exposition we think it may not be said the verdict was without support in the evidence nor that it was based on conjecture and speculation.

We come now to what we consider the most important matter in this appeal and that is whether the verdict of the jury was procured as a result of corruption of the prevailing party. At an early stage of the trial it became clear the most important fact for determination was the date or time when appellee's land became polluted, and much evidence was received on that point during the trial which took more than a week. Necessarily we must summarize the evidence on the trial and on the motion for a new trial, but in so doing we follow the order in which the evidence was received. Sigmund Boxberger, a son of the appellee, after testifying at length about the farm, the watercourses and wells on it, and that he and his brother Sam were farming the place in 1938 and 1939, testified that the water changed in July or August of 1939; that it was bitter and salty and the cattle were not drinking out of the pond and that they bought a tank which was filled from a well which had been deepened and which had good water in it. On cross-examination, he repeated the above and stated that the tank was purchased at Galatia, Kan., from Johnny Morganstern. At a later time his father, the appellee, testified as to conditions generally and that he first noticed a change in the water in 1939; that it got salty and bitter; that he quit using the water from the springs and ponds in the fall of 1939, the water then was polluted; that he had to buy a tank so that he could use water from the deepened well for the cattle and that he had watered out of that tank since the fall of 1939; that the tank had been purchased from John Morganstern at Galatia in the fall of 1939; that he had not personally bought the tank but his sons Sam and Sig dealt with Morganstern; that he had sent Sig to buy the tank but that he, appellee, had paid for it, and that it was the tank he was then using and that it was the only tank he had purchased from the Wildgen Lumber Company at Galatia. On cross-examination, appellee steadfastly maintained the purchase was in October, 1939, and not in October,

1938. The testimony of appellee and his son Sig made it clear that the water in the springs and the ponds from which the cattle were watered became unfit for use prior to the purchase of the tank from Morganstern at Galatia. Morganstern was called as a witness by the defendants and testified that he worked for the Wildgen Lumber Company at Galatia; that he knew appellee and his son Sam and neither was at his place in 1938 but that Ted Boxberger was; that he sold him a six-foot stock tank on October 19, 1938, for $19.50, and that the tank at the time of the trial was at appellee's farm; that he had identified it by his cost mark on it and that it was sitting north of the house with a pipe running from the windmill to it. He produced the original sales ticket and it was received in evidence. He was later recalled and testified that during the year 1939 he had sold no tank to any member of appellee's family.

On rebuttal Ted Boxberger stated he had not bought any tank from the Wildgen Lumber Company of Galatia on October 19, 1938. Sam Boxberger, who was not previously a witness, testified on rebuttal that he bought a tank from the Wildgen Lumber Company at Galatia about October 19, 1938, at which date he was living on the Kraft place; that he purchased it for himself and none of his brothers were with him, and that shortly thereafter he had taken the tank to Liberal Kan., where he was employed on a railroad construction gang; that later about March, 1939, he returned to Russell county, leaving the tank at Liberal, and that later he delivered the tank to his father in the summer of 1939.

As has been noted the jury answered special questions. We note three of them and the answers thereto:

"3. On what specific date do you find Boxberger purchased a water tank from the Wildgen Lumber Company of Galatia, Kansas? A. October 19, 1938. By Sam Boxberger.

"3-A. What was the purpose of plaintiff in purchasing said tank? A. To use on Kraft farm.

"4. Do you find that the water in the creek, pond and spring on plaintiff's land was polluted at the time the water tank was purchased? A. No."

The general substance of other answers was that the water and lands are now polluted, but were not prior to May 29, 1939.

On the hearing of the motion for a new trial, David Kraft stated that Sam Boxberger lived in a house on his place from March until late in October, 1938; he had one water tank and left it when he moved and two Meier boys came and got it. George D. Meier testified that he was the father-in-law of Sam Boxberger and that the

tank on the Kraft farm was a small one, it wasn't new, and after Sam left the Kraft place the tank was taken to witness' place where it remained until July, 1941. John Morganstern testified that during the course of the trial Sam Boxberger came to see him relative to the tank transaction and said "he would make it right with me if I would tell the correct answers."

Other evidence corroborative or explanatory of defendants' version of the tank transaction, and tending to show that appellee and his son Sam had testified falsely need not be reviewed.

At the conclusion of the hearing of the motion for a new trial, the trial court, after stating most of the evidence, if not all of it, went largely to discrediting the testimony of Sam Boxberger and that part of it was cumulative and part of it was repetition, then said it really didn't know what to think of the testimony of appellee and his son Sam, and—

"They both testified falsely in some part of their testimony. I don't know whether it was a deliberate attempt at perjury, or whether it was ignorance, or a reckless disregard for the facts."

And, as had been stated, the court was the thirteenth juror, yet the jury was of good men and the court felt it ought not to set aside any verdict it reached; that the jury had had the advantage of inspecting the land (it may here be said a recess was taken while plaintiff was testifying and the jury then inspected the land) and in that way could corroborate the testimony, as they had seen the conditions; that the defense was largely the statute of limitations, and the court did not believe if all the testimony offered on motion for a new trial had been before the jury, it would necessarily have influenced the verdict. At no place in the record do we find any place where the trial court placed its approval on the verdict further than as may be implicit in its rendering judgment thereon.

From the trial court's remarks, it is clear that if it did not believe so before, after the evidence on the motion for a new trial was heard it believed appellee and his son Sam had testified falsely. That the falsity pertained to the purchase of the tank is clear, and that it went to a matter vital to appellee's recovery and not to a collateral matter is equally clear. The jury did not hear this latter testimony and its verdict without it could not have the weight and effect the trial court gave it. It matters not whether the trial court was correct or not in saying the testimony was cumulative and not newly discovered or that diligence could have sooner produced it, and as to

that we shall not comment, but after it was received, if not before, the trial court was convinced that two principal witnesses had testified falsely as to material facts. Under those circumstances, it made no difference that the jury was made up of substantial citizens, or that they had inspected the premises. Inspection of the premises could not and did not show when the tank was installed. The jury which heard only a part of the whole story, didn't believe all of it, and made one finding not supported by the evidence as is shown later. Once the trial court was convinced at the hearing on motion for a new trial that appellee and his son Sam had testified falsely as to material matters, it should not have sought refuge in the verdict of the jury but should have exercised its independent judgment, and have granted another trial.

We mention, for the purpose of disposing of it, appellants' contention that appellee is bound by his own statements, and under the rule stated in *Durham v. C. C. & M. Co.*, 22 Kan. 232, syl. ¶ 2, that his statement as to when the water became polluted, when taken into consideration with the testimony as to when the tank was purchased, shows that his cause of action arose over two years before he commenced his action, and therefore appellants are entitled to judgment. It is our opinion that in view of the state of the record, the application of the rule would be harsh and arbitrary, and it will not be applied.

Attention has been directed to the fact that there was no motion for judgment *non obstante veredicto*. In their brief appellants make some contention they are entitled to judgment in their favor on the answers to special questions. Attention is redirected to those quoted above. Other answers, which need not be set out, but which find some support in the testimony of witnesses other than appellee and his son Sam, are to the effect the pollution and damage occurred on and after May 29, 1939. The jury found the tank was purchased in October, 1938. That part of its answer that it was purchased by Sam Boxberger was not responsive to the question and, waiving for the moment the question of false testimony, it should be ignored. The answer it was purchased for use on the Kraft farm is not supported by the evidence. The Kraft farm was not mentioned until Sam Boxberger first took the stand as a witness in rebuttal, and, assuming his testimony was entitled to full credence, the substance of it was that he bought the tank in October, 1938, at which time he lived on the Kraft place, and took it with him to Liberal, Kan.,

where he worked on a railroad right of way and where he stayed five or six months, returning in March, 1939, to his father-in-law's place; that he left the tank at Liberal and in the summer of 1939 he delivered it to his father. At no place in the record is there any testimony that the tank was ever used on the Kraft place or that the plaintiff appellee or his son Sam purchased it for that purpose. It may be observed that five or six months previous to March, 1939, was September or October, 1938. The answer to question 3-A should have been set aside. The answer to question 4 is directly opposed to the testimony of appellee, and is not supported by the testimony of any other witness. The answer should have been set aside. But with that done the answers were still conflicting and not reconcilable with each other and with the general verdict. Under such circumstances a new trial should have been allowed.

Some other matters have been mentioned in the briefs, but in view of our conclusions, they need not be discussed.

The judgment of the trial court is reversed and the cause remanded with instructions to grant a new trial.